[No. B087436. Second Dist., Div. Two. May 14, 1996.]

MARTIN LUBNER et al., Plaintiffs and Appellants, v.
CITY OF LOS ANGELES et al., Defendants and Respondents.

**COUNSEL**

Overland & Gits and Mark E. Overland for Plaintiffs and Appellants.

James K. Hahn, City Attorney, G. Daniel Woodard and Katherine J. Hamilton, Assistant City Attorneys, and Janet G. Bogigian, Deputy City Attorney, for Defendants and Respondents.

**OPINION**

**NOTT, J.**—In a factual scenario that seems to have been taken from a law school hypothetical, two artists lost much of their life work after a city trash truck parked at the top of a hill rolled down and crashed into their home, damaging the house, two cars and their artwork, which included paintings, drawings, prints and posters. We are asked to permit the artists, Martin and Lorraine Lubner, to recover damages based on either loss of reputation or emotional distress. Even though we sympathize with appellants, established law does not permit us to recognize the type of damages they seek.

### BACKGROUND

The Lubners sought compensation from their homeowners insurance carrier, State Farm. There was a dispute over the value of the art, and the matter went to arbitration. The Lubners recovered $309,000 from State Farm.[1] Of that amount, approximately $260,000 was paid as property damages for the artwork.

The Lubners filed a negligence action against respondent City of Los Angeles for property damages that exceeded their insurance policy limits,

---

[1] State Farm, as subrogee, settled its action against the city to recover the amount paid to the Lubners by accepting payment of $245,000.

and for emotional distress and loss of reputation. The Lubners attempted to introduce evidence of their experience and stature as painters. The evidence showed that they have both been painters for more than 40 years; that Martin has been an instructor in painting and drawing at the University of Southern California, University of California at Los Angeles, and the College of Creative Studies in Santa Barbara; that his paintings have been exhibited throughout the United States, Italy, England and Scotland; that some of his works have been acquired by the Museum of Contemporary Art in Los Angeles, the Albany Junior College Museum in New York, the Contemporary Arts Council of Great Britain, and the Neuberger Museum at the State University of New York; that Lorraine's works have been exhibited throughout California and in London; that her works are contained in various public collections in New York and London; and that Martin's paintings have been sold to collectors in the United States and Europe since 1954, and Lorraine's works have been similarly sold since 1964. *In limine* rulings precluded the Lubners from presenting this evidence.

The trial court ruled that emotional distress damages were not permitted in property damage cases, and that the Lubners could not recover for damage to their reputation under Civil Code section 987. Finally, the trial court denied the Lubners' request for attorney fees. As a result, the matter went to trial on the issue of the fair market value of the artwork.

Following a court trial, the Lubners were awarded $293,000. The court added to that figure amounts to which the parties had stipulated for other uncompensated losses, for a total of $317,594.44. From the total, the court subtracted the amount the Lubners recovered from State Farm for the lost art, $265,820. The court then granted judgment in favor of the Lubners for the difference, $51,774.44.

DISCUSSION

1. *Loss of Reputation*

The Lubners assert the right to be compensated for damages to their artistic reputation resulting from the destruction of their paintings. They rely on the California Art Preservation Act, Civil Code section 987 (section 987), but only on subdivision (a). Subdivision (a) of section 987 states the Legislature's declarations and findings, and includes the statement that "physical alteration or destruction of fine art, which is an expression of the artist's personality, is detrimental to the artist's reputation, and artists therefore have an interest in protecting their works of fine art against any

alteration or destruction . . . ."[2] Section 987, subdivision (e) to "effectuate the rights created by this section," permits the artist to sue for injunctive relief as well as actual and punitive damages. The question is the scope of the rights created by the statute. Does the statute permit a cause of action for damages for the destruction of fine art due to simple negligence, as the Lubners contend?

Subdivision (c)(1) of section 987 provides that no one but the artist who owns and possesses a work of fine art "shall intentionally commit, or authorize the intentional commission of, any physical defacement, mutilation, alteration, or destruction of a work of fine art." Pursuant to subdivision (c)(2), acts constituting gross negligence causing defacement, mutilation, alteration or destruction of fine art by one who frames, conserves or restores fine art are prohibited. Nothing in subdivision (c) or in any another subdivision of the statute explicitly permits an action based on simple negligence. The Lubners argue that the right is found in subdivision (a).

 In construing a statute, courts begin by ascertaining the legislative intent so as to effectuate the purpose of the law. (*Botello* v. *Shell Oil Co.* (1991) 229 Cal.App.3d 1130, 1134 [280 Cal.Rptr. 535].) We are obliged to construe the statute according to the Legislature's own statement of its purpose, if we can. (*Id.*, at p. 1135.) As noted, the legislative statement found in section 987, subdivision (a) declared that destruction of fine art is detrimental to the artist's reputation. To adopt the Lubners' position we must conclude that by this statement the Legislature intended to imply a remedy for simple negligence while recognizing that remedies for other torts are explicit in another section of the statute.

 As a rule, courts should not presume an intent to legislate by implication. (*San Diego Service Authority for Freeway Emergencies* v. *Superior Court* (1988) 198 Cal.App.3d 1466, 1472 [244 Cal.Rptr. 440].) "Although in years past it may have been necessary for courts to read into a statute provisions not specifically expressed by the Legislature, the modern rule of construction disfavors such practice. [Citation.]" (*Ibid.*) " '[F]or a consequence to be implied from a statute there must be greater justification for its inclusion than a consistency or compatibility with the act from which it is implied. "A necessary implication within the meaning of the law is one that is so strong in its probability that the contrary thereof cannot reasonably be supposed." ' " (*Woodland Joint Unified School Dist.* v. *Commission on Professional Competence* (1992) 2 Cal.App.4th 1429, 1451 [4 Cal.Rptr.2d 227], italics omitted.)

As commentators have noted, section 987 was the first statute in the United States to recognize that an artist has personal rights in his or her work

---

[2]The definition of fine art in subdivision (b)(2) includes original paintings.

which are retained even after the work has been sold. This bundle of rights is known by the French term *droit moral*, translated into English as "moral rights." (Petrovich, *Artists' Statutory Droit Moral in California: a Critical Appraisal* (1981) 15 Loyola L.A. L.Rev. 29.) Among these moral rights, which are also known as the "right of the author's personality," is the right of integrity, which includes the right to object to the destruction of one's work and to prevent its mutilation, distortion, or alteration. (Karlen, *Moral Rights in California* (1982) 19 San Diego L.Rev. 675, 684-685.) The classic example of a violation of the right of integrity occurs when the owner of a work of art alters it and then continues to display it. (Petrovich, *supra*, at p. 37.) Professor Karlen states, "[T]he artist must be entitled to certain rights in order to survive as a professional. For instance, the artist must be able to require credit for his work in order to establish a reputation. Conversely, he must be able to disassociate himself from work which is not *his* including his work which has been so badly altered that it no longer expresses his creative efforts. Further, to mount exhibitions, especially retrospective ones, he should have access to works he has created earlier in his career. To do so, he must be able to locate the owners of the works and to prevent destruction of the works. To effectuate the right to restrain destruction, the artist should have the right to repair damaged works or to conserve decaying works so that careless abandonment does not put the work of art beyond redemption. . . ." (Karlen, *supra*, at p. 682.)

 Though Professor Karlen states that the artist must be able to prevent the destruction of his or her art, the context of the statement indicates that he is referring to intentional destruction. The ideas expressed by the commentators cited here and others we have read do not support the position that the theory of moral rights justifies finding in section 987 an implied remedy for destruction due to simple negligence. The Lubners offer no justification for so reading section 987. Furthermore, the plain language of the statute does not support the Lubners, and we have found nothing to lead us to the conclusion that the Legislature could not possibly have left out such a remedy, as required by the *Woodland* case.

The Lubners argue that we should exercise our judicial power to create a common law right, separate from section 987, to recover damages for loss of reputation. As stated by the Supreme Court in *Rojo* v. *Kliger* (1990) 52 Cal.3d 65, 79 [276 Cal.Rptr. 130, 801 P.2d 373], where a statute creates a right that did not exist at common law and provides a comprehensive and detailed remedial scheme for its enforcement, the statutory remedy is exclusive. Section 987, with its specification of rights and duties, remedies, and statutory limitations periods, among other things, falls within the general rule, by which we are bound. The enactment of section 987 precludes a common law recovery for the Lubners.

Moreover, it appears that section 987 has been preempted by the Visual Artists Rights Act of 1990 (Judicial Improvements Act of 1990, Pub.L. No. 101-650 (Dec. 1, 1990) §§ 601-610, 104 Stat. 5128-5133). (See Zuber, *The Visual Artists Rights Act of 1990—What it Does, and What it Preempts* (1991) 23 Pac. L.J. 445, 491-502.) "On or after the effective date set forth in section 610(a) of the Visual Artists Rights Act of 1990, all legal or equitable rights that are equivalent to any of the rights conferred by section 106A with respect to works of visual art to which the rights conferred by section 106A apply are governed exclusively by section 106A and section 113(d)[3] and the provisions of this title relating to such sections. Thereafter, no person is entitled to any such right or equivalent right in any work of visual art under the common law or statutes of any State." (17 U.S.C.A. § 301(f)(1).) A work of visual art is defined to include paintings. (17 U.S.C.A. § 101.) As pertinent here, 17 United States Code Annotated section 106A states that the author of a visual art shall have the right "to prevent any destruction of a work of recognized stature, and any intentional or grossly negligent destruction of that work is a violation of that right." (17 U.S.C.A. § 106A(a)(3)(B).)

Accepting the Lubners' argument that they are recognized artists who have created and exhibited their paintings and drawings for over 40 years, we assume that their art included works of recognized stature under 17 United States Code Annotated section 106A. (See *Carter* v. *Helmsley-Spear, Inc.* (S.D.N.Y. 1994) 861 F.Supp. 303, 325, affd. in part, revd. in part, vacated in part by *Carter* v. *Helmsley-Spear, Inc.* (2d Cir. 1995) 71 F.3d 77 (petn. for cert. filed Feb. 29, 1996) [requiring a two-tiered showing by the artist: the visual art is viewed as meritorious and this stature is recognized by art experts, other members of the artistic community, or by some cross-section of society].) Though no case has as yet interpreted subdivision (f)(1), the clear language limits recovery for destruction of visual arts to intentional or grossly negligent destruction. Thus, though it is not certain whether the California statute and the federal legislation are equal in scope (see Zuber, *The Visual Artists Rights Act of 1990—What it does, and What it Preempts*, *supra*, 23 Pac. L.J. at pp. 492-502), if section 987 is preempted by the federal legislation, the Lubners' action for damages resulting from simple negligence is not permitted.

We conclude that the trial court did not err in precluding the Lubners from presenting evidence on loss of reputation.

## 2. *Emotional Distress Damages*

The Lubners contend that they are entitled to recover damages for the emotional distress they suffered due to the loss of their artwork. We

---

[3]Title 17 United States Code Annotated section 113(d) addresses works of visual art that have been incorporated into or made part of a building, and it has no application to this matter.

recognize that the artwork may have been extremely important to appellants from financial, personal, and professional standpoints. Nevertheless, the artwork is property and, for that reason, appellants are subject to the rule that recovery for emotional distress caused by injury to property is permitted only where there is a preexisting relationship between the parties or an intentional tort. (*Cooper* v. *Superior Court* (1984) 153 Cal.App.3d 1008, 1012 [200 Cal.Rptr. 746], disagreed with on another point in *Smith* v. *Superior Court* (1992) 10 Cal.App.4th 1033, 1040, fn. 1 [13 Cal.Rptr.2d 133].) *Cooper* is the controlling authority in this matter, but the Lubners do not attempt to bring this case within the rule stated in *Cooper*. Rather, they cite to other cases, not involving emotional distress caused by property damage, in an attempt to circumvent *Cooper*.

First in these cases is *Pleasant* v. *Celli* (1993) 18 Cal.App.4th 841 [22 Cal.Rptr.2d 663], (disapproved on other grounds in *Adams* v. *Paul* (1995) 11 Cal.4th 583, 591, fn. 4 [46 Cal.Rptr.2d 594, 904 P.2d 1205]), in which this division held that a plaintiff in a legal malpractice action could not recover emotional distress damages. In its exposition of the law, the *Pleasant* opinion quoted *Ochoa* v. *Superior Court* (1985) 39 Cal.3d 159, 168 [216 Cal.Rptr. 661, 703 P.2d 1], a bystander recovery[4] case, as follows: "Imposition of liability may be warranted 'when there is a high degree of foreseeability of shock to the plaintiff and the shock flows from an abnormal event. . . .'" (18 Cal.App.4th at p. 853.) The Lubners argue that this case fits within that description, because the crash of the runaway trash truck was an abnormal event that created a high degree of foreseeability of shock.

In *Thing* v. *La Chusa*, *supra*, 48 Cal.3d 644, the Supreme Court rejected foreseeability as the sole test for determining the right to recover for emotional distress. The opinion stated: "It is apparent that reliance on foreseeability of injury alone in finding a duty, and thus a right to recover, is not adequate when the damages sought are for an intangible injury. In order to avoid limitless liability out of all proportion to the degree of a defendant's negligence, and against which it is impossible to insure without imposing unacceptable costs on those among whom the risk is spread, the right to recover for negligently caused emotional distress must be limited." (*Id.*, at p. 664; and see *id.* at p. 654, fn. 3.)

*Thing*'s test for determining who is entitled to recover for negligently inflicted emotional distress damages, by limiting the importance of foreseeability, also limited the class of plaintiffs. *Thing* held that ". . . a plaintiff

---

[4]The bystander theory extends the right to recover for negligent infliction of emotional distress suffered as a result of observing the pain and suffering accompanying an injury to another. (See *Thing* v. *La Chusa* (1989) 48 Cal.3d 644, 647, fn. 1 [257 Cal.Rptr. 865, 771 P.2d 814] .)

may recover damages for emotional distress caused by observing the negligently inflicted injury of a third person if, but only if, said plaintiff: (1) is closely related to the injury victim; (2) is present at the scene of the injury producing event at the time it occurs and is then aware that it is causing injury to the victim; and (3) as a result suffers serious emotional distress—a reaction beyond that which would be anticipated in a disinterested witness and which is not an abnormal response to the circumstances." (48 Cal.3d at pp. 667-668, fns. omitted.)

*Thing* assumes that to recover for emotional distress as a bystander the injury-producing event must have caused injury to a person, not to property, and that the witnessing of that event and injury caused emotional distress to the plaintiff. Neither *Thing*, *Pleasant* nor *Ochoa* involved emotional distress that followed injury to property, though *Pleasant* was a direct injury case and therefore did not involve injury to a third person.[5]

In *Pleasant* the underlying cause of the emotional distress to the plaintiff was the defendant attorney's mishandling of her lawsuit. We noted there that liability for negligent infliction of emotional distress required the consideration of several factors to determine whether the defendant breached a duty of care to the plaintiff. (*Pleasant* v. *Celli*, *supra*, 18 Cal.App.4th at p. 852.) Those factors include foreseeability of harm to the plaintiff, the degree of certainty that plaintiff suffered injury, the closeness of the connection between the defendant's conduct and the injury, the moral blame attached to the defendant's conduct, the policy of preventing future harm, the extent of the burden on the defendant and consequences to the community of imposing a duty to exercise care with resulting liability for breach, and the availability, cost and prevalence of insurance for the risk involved. (*Ibid.*) In determining duty, we must decide not whether a particular plaintiff's injury was reasonably foreseeable in light of a particular defendant's conduct. Rather, we evaluate more generally whether the category of negligent conduct at issue is sufficiently likely to result in the kind of harm experienced that liability may appropriately be imposed on the negligent party. (*Thing* v. *La Chusa*, *supra*, 48 Cal.3d at p. 654, fn. 3.)

Turning to the facts of this case, it is highly unlikely that the negligent parking of a trash truck would result in the destruction of an artist's body of work, though we have to agree that generally speaking, an artist would experience emotional distress at having his or her body of work destroyed.

---

[5]Similarly, the Lubners cite *Huggins* v. *Longs Drug Stores California, Inc.* (1993) 6 Cal.4th 124, 129 [24 Cal.Rptr.2d 587, 862 P.2d 148], for a statement of duty in bystander cases. *Huggins*, like *Pleasant*, presented a question of duty in the context of direct, not bystander, recovery.

Here, as in *Pleasant* and in *Merenda* v. *Superior Court* (1992) 3 Cal.App.4th 1, 11 [4 Cal.Rptr.2d 87], the moral blame on the defendant city is only that which attends ordinary negligence. Nothing in the record indicates bad faith or reckless indifference to the Lubners' emotional tranquillity. The policy of preventing future harm is served by the sanction of compensation for the economic loss, which also meets the factor of the burden on the defendant to avoid runaway trash trucks in the future. The principal consequences to the community of imposing an incremental liability for these damages are the additional taxes to citizens of the city in exchange for city services. Nothing in the record addresses the availability and costs of insurance for the risk of negligently inflicting emotional distress. On balance, the factors do not favor permitting the emotional distress damages.

Thus, even if we were to conclude that *Cooper* is not controlling, which we do not, analysis of the factors for determining duty compels the conclusion that emotional distress damages may not be recovered by the Lubners in this case.

### 3. *Attorney Fees*

■ The Lubners acknowledge that they are not entitled to attorney fees under the general rule stated in Code of Civil Procedure section 1021, which provides that in the absence of an agreement or statutory provision, attorney fees are not recoverable. They cite *Prentice* v. *North Amer. Title Guar. Corp.* (1963) 59 Cal.2d 618 [30 Cal.Rptr. 821, 381 P.2d 645], for an exception to the general rule. *Prentice* states that a person who through the tort of another has been required to act in the protection of his interests by bringing or defending an action against a third person is entitled to recover compensation for the reasonably necessary loss of time, attorney fees and other expenditures thereby suffered or incurred. (*Id.*, at p. 647; *Saunders* v. *Cariss* (1990) 224 Cal.App.3d 905, 910 [274 Cal.Rptr. 186]; *Moe* v. *Transamerica Title Ins. Co.* (1971) 21 Cal.App.3d 289, 303 [98 Cal.Rptr. 547].) For example, in both *Prentice* and *Moe*, because the title company breached its duty of care to the seller, the seller was forced to sue a third party to protect its interests. The title company was held liable for seller's attorney fees in the action against the third party. (59 Cal.2d at p. 621; 21 Cal.App.3d at pp. 302-303.)

The Lubners contend that the exception applies here because they had to file an action against their insurance company because the city unjustifiably denied their claim for damages, filed pursuant to Government Code section 911.2. However, the city's denial of the Lubners' claim was not a breach of the city's duty of care to the Lubners. Thus, the attorney fees exception recognized and applied in the above cited cases does not apply here.

The Lubners also rely on *Brandt* v. *Superior Court* (1985) 37 Cal.3d 813 [210 Cal.Rptr. 211, 693 P.2d 796]. The issue in Brandt was whether an insurer's tortious withholding of benefits, which caused the insured to incur attorney fees to compel payment of the policy benefits, permits the insured to recover those fees as an element of damages resulting from the tortious conduct. The Supreme Court held that the fees were recoverable, citing *Prentice*, among other authorities. (*Id.*, at pp. 817-820.)

This case is distinguishable from *Brandt*, because, as noted above, the city's denial of a claim filed pursuant to the Government Code was not a tortious act. Moreover, the Lubners' action against State Farm was not based on the insurer's denial of the claim, but on the dispute between the parties over the value of the art work.

We conclude that the Lubners are not entitled to attorney fees.

### DISPOSITION

The judgment is affirmed.

Boren, P. J., and Zebrowski, J., concurred.

Appellants' petition for review by the Supreme Court was denied August 28, 1996. Mosk, J., was of the opinion that the petition should be granted.